# STATE OF MICHIGAN

# COURT OF APPEALS

TERI WALTERS and KIM WALTERS,

  Plaintiffs-Appellants,

v

DONALD S. FALIK, D.D.S., d/b/a FALIK
FAMILY DENTISTRY, ROBERT C. FALIK,
D.D.S., and JANE DOE,

  Defendants-Appellees.

UNPUBLISHED
January 29, 2015

No.  319016
Eaton Circuit Court
LC No.  12-000658-NH

Before:  MURPHY, P.J., and METER and SERVITTO, JJ.

METER, J. (*dissenting*).

Because I believe that the lower court properly exercised its discretion in excluding the testimony of Dr. M. Eric Gershwin, I respectfully dissent.  I would affirm the trial court's ruling.

Plaintiffs contended that defendants erroneously provided phosphoric acid etching solution to Teri Walters instead of the teeth-whitening solution that they were supposed to have provided.  In February 2011, Teri used this solution overnight.  Defendant Donald Falik agreed that etching solution is only intended to be used for seconds at a time.  Teri testified at her deposition that in the morning after she used the solution, it felt like her mouth was burning.  She claimed that defendants admitted giving her the wrong solution and that they attempted to repair the stains that had resulted on her teeth.

In April 2011, Teri was diagnosed with chronic sinusitis and later complained of a plugging sensation in her left ear.  After persistent symptoms, she was diagnosed with Wegener's granulomatosis (WG), an autoimmune disease that shortens typical lifespan and that is characterized by symptoms such as inflammation of the sinuses and lungs.  Plaintiffs' proposed expert witness, Gershwin, testified during his deposition that, in his opinion, Teri developed WG because of the use of the etching solution combined with a genetic predisposition to WG.

Gershwin testified that WG occurs in persons who are genetically predisposed to having a "promiscuous" immune system that is highly responsive to antibodies.  He stated that some mechanism will induce the death of cells, causing the release of a "neutrophillic antigen," and a person who is genetically susceptible will then mount an immune response.  He testified that there are a variety of environmental agents that can contribute to the response.  Gershwin admitted that he had provided no literature concluding that phosphoric acid causes or contributes

to WG, but stated that there are data about solvents, hydrocarbons, and silica, which is adjacent to phosphorus on the periodic table. Gershwin testified that what happened was that the phosphoric acid hit water, dissociated, and produced a large inflammatory response. He opined that although plaintiff might have gotten WG at some point regardless, she would not have gotten it when she did without the exposure to the etching solution.

Defendants filed a motion in limine to exclude Gershwin's testimony due to lack of supporting evidence that exposure to phosphoric acid is recognized as a cause of WG. The trial court heard argument on the motion on September 19, 2013, and issued its decision from the bench.

Applying MRE 702, the court found that Gershwin was highly qualified in the field and that expert testimony would assist the trier of fact, but went on to find that it was questionable whether his opinion was based on sufficient facts. The court found that the majority of the articles presented by the parties indicated that the etiology for WG was unknown, and none of the studies referred to phosphoric acid or any kind of acid exposure as a cause. The court noted that the literature did not support Gershwin's conclusions with the same degree of certainty that he professed. The court stated that "the cutting edge of medicine is simply not the standard for a courtroom. In applying MRE 702, I just don't find his testimony reliable enough to allow it to go to the jury. So I'm going to grant the motion."

Plaintiffs' counsel questioned the court regarding the possibility of a *Daubert*[1] hearing. The court stated that it would not preclude a hearing, but it was doubtful whether plaintiffs would be able to prevail. The court specifically stated that there was sufficient time for such a hearing to take place and even stated that it would make accommodations to allow for Gershwin to testify by video. Plaintiffs did not pursue a hearing.

Plaintiffs now contend that the trial court erred in granting defendants' motion in limine. This Court reviews for abuse of discretion a trial court's decision whether to admit evidence. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007).

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MCL 600.2955 provides:

---

[1] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

(1)   In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact.  In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c)   The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community.  As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2)  A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

(3)   In an action alleging medical malpractice, the provisions of this section are in addition to, and do not otherwise affect, the criteria for expert testimony provided in section 2169.

In *Chapin*, 274 Mich App at 133, the Court recognized the reliance of the expert witness on the "Sir Bradford Hill" methodology for determining causation.

The Sir Bradford Hill methodology, as explained by Dr. Lemen, contains nine criteria, all of which should be considered when determining causation. "Strength of association" means a sufficiently strong association between a substance and an effect can permit conclusions without statistical epidemiologic data.  For example, no epidemiological studies were needed to show that cyanide

gas kills film-recovery plant workers when they are exposed to it. Dr. Lemen explained that epidemiological evidence "is clearly the best that we've got" and "it leaves little doubt" when it exists, but it was not needed to draw conclusions on which to base preventive actions. "Temporality" means that cause must precede effect or there can be no association. "Biologic gradient," or "response gradient," refers to basic toxicological knowledge that more exposure increases the risk of disease, as asbestos does. "Consistency" means a given effect must "be observed repeatedly in multiple studies," preferably different kinds of studies, and "specificity" means an agent always causes the same kind or kinds of disease. It is undisputed that asbestos consistently causes the same few diseases. "Biological plausibility" looks at whether a theory of causation comports with other known facts, such as whether an agent can actually affect a certain body part, and asbestos fits this criterion. "Coherence" is similar to biological plausibility in that it checks for inconsistency with other theories of causation. Dr. Lemen noted that the animal studies and the biological studies on asbestos fit together. "Experimental evidence" could include animal and laboratory studies in the case of asbestos, and the experimental evidence also connected asbestos to the same diseases. It would, of course, be unethical to perform clinical experiments on people by deliberately exposing them to asbestos to confirm its toxicity, no matter how probative such an experiment might be.

The final factor in the Sir Bradford Hill methodology is "analogy." Dr. Lemen explained that, as applied to the circumstances of this case, "analogy" looks at whether automobile brake workers are actually exposed to enough of the agent under discussion to cause disease. Dr. Lemen again stated that there was no known safe exposure level to asbestos below which it would not cause mesothelioma, and studies exist showing that automobile brake workers are exposed to asbestos, thereby indicating a cause and effect relationship. On the basis of all of the foregoing factors, combined with the known asbestos exposure and "thousands of epidemiological studies and animal studies and toxicological studies," Dr. Lemen concluded that there was ample scientific evidence to link mesothelioma to occupational exposure to asbestos-containing brake products. Dr. Lemen further pointed out that none of the factors was dispositive by itself, but the best way to determine causation was to consider them all and to further consider reports issued by governments and health agencies or organizations. [*Id.* at 133-135.]

In place of an epidemiological study, plaintiffs primarily rely on the Bradford Hill method to support their theory of causation and to support their argument that Gershwin's testimony was admissible. However, the trial court thoughtfully considered the Bradford Hill method in reaching its conclusions and it carefully distinguished the *Chapin* case. The trial court noted that in *Chapin*, "the history with asbestos, asbestos causing these problems [i.e., mesothelioma] was clearly well established. . . . [A]sbestos affects all individuals who are exposed to it in essentially the same way." The only dispute in *Chapin* concerned whether *brake workers*, in particular, would develop mesothelioma as a result of exposure to asbestos-based brake products during their work. See *id*. at 135. The present case is fundamentally different because there are evidently no studies showing that phosphoric acid causes WG. Importantly,

-4-

*Gershwin himself* admitted that none of the literature he provided showed such causation. Under the circumstances, I simply cannot find that the trial court abused its discretion by granting defendants' motion in limine. "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). The court's decision was not outside the range of principled outcomes. I note that the Michigan Supreme Court "has implied that, while not dispositive, a lack of supporting literature is an important factor in determining the admissibility of expert witness testimony." *Id*. at 640. The court did not abuse its discretion in essentially concluding that Gershwin's testimony amounted to speculation.

It is at least conceivable that a more expansive hearing would have provided additional support for Gershwin's theory, but plaintiffs failed to pursue a *Daubert* hearing even after being specifically invited to do so by the trial court.

I would affirm.

/s/ Patrick M. Meter